Filed 8/24/15  In re S.L. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re S.L. et al., Persons Coming Under the Juvenile Court Law. | C077464 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, Plaintiff and Respondent, v. S.J., Defendant and Appellant. | (Super. Ct. Nos. JD234730, JD234731, JD234732, JD234734) |

Mother, S.J., appeals from the juvenile court's dispositional order removing the minors from her care.  (Welf. & Inst. Code, §§ 300, 361, 395 [unless stated otherwise, statutory references that follow are to the Welfare and Institutions Code].)  She contends there is insufficient evidence to support a finding that the conditions of the home created a substantial danger to the minors or that the injury to one of the minors, and home treatment of that injury, demonstrated there was a substantial danger to the minors should

1

they remain at home. She further contends that there were available reasonable alternatives to removal. We affirm the juvenile court's order.

FACTS AND PROCEEDINGS

On May 13, 2014, the Sacramento County Department of Health and Human Services (Department) received a referral alleging that six-year-old N.L. had come to school with burns on both forearms and circular burns on her stomach. Consequently, at 4:40 p.m. that day, Stefanie Hess, an emergency response social worker, made an unannounced visit to the minor's home. The minor's 11-year-old sibling, T.D., answered the door and told the social worker his mother was asleep. T.D. then recanted and stated that there were no adults in the home and he was babysitting N.L. and another younger sister. T.D. stated his mother did not have a phone and he did not know when she would be returning home.

An hour later, Hess made another unannounced visit, accompanied by police officers, but no one answered the door. Because mother was on searchable probation and the officers were requested to perform a welfare check, officers entered the home through an unlocked window. Having determined no one was home, the officers suggested Hess see the condition of the home. Hess went into the house and saw that the home had three bedrooms and one bathroom. None of the beds had sheets or blankets, both the bathtub and the kitchen sink were clogged with slimy water, and there was spoiled food in the kitchen and living room. The floors throughout the home were filthy and sticky with debris and trash. The laundry room was stacked with multiple large black bags which appeared to be filled with clothes. Food on the stove showed someone was in the process of making lasagna or spaghetti.

One of the police officers described the condition of the home as follows: "The inside of the residence was completely strewn with garbage. There were dirty clothes and blankets all over the floors in every room. There were food remnants that had

2

obviously been left out for several days all over the house. The kitchen sink was left flooded with dirty water and dishes. The bathroom tub was filled with approximately 3 inches of stagnant water that appeared to be growing mold. Diapers, garbage bags, and miscellaneous items were all over the floor in the family room area. Although there were approximately 7 children listed as residents in the house, there were only two mattresses placed on the ground in the house. A third mattress was located inside but was pushed up against the wall and did not appear to be in use."

Police officers returned for another welfare check around 10:00 p.m. and saw mother pulling out of the driveway with five of her children in the car. The maternal grandmother was also in the car. Mother was arrested for child endangerment and minors D.D. (then age 12), T.D. (then age 11), J.L. (then age eight), N.L. (then age six), and S.L. (then age nine months) were taken into protective custody.

Hess met with mother in the county jail to discuss the condition of the home and N.L.'s burns. Mother said that she had been at home, napping, when Hess made her initial unannounced visit. With respect to the condition of the house, mother stated that it had been clean two days earlier and that it was difficult to maintain a clean home with so many children. She denied that the kitchen sink was clogged but admitted that the bathtub was clogged and she had been using a plunger on it.

As for N.L.'s burns, mother said that on the night of May 12, 2014, she was in the bathroom combing her hair. Infant S.L. was in the bathroom with her. J.L. and N.L. came into the bathroom and talked to her, then left. J.L. came back shortly thereafter and told her that N.L. had burned herself. Mother denied that she heard N.L. cry or scream. She asked N.L. what happened and the minor told her someone had turned on the stove burner and a piece of paper was sitting on it and caught fire. The paper fell on N.L.'s shirt, which caught fire, and N.L. tried to put the fire out with her arms. Mother saw the burns on N.L.'s arms and stomach but did not take the child to the doctor because she did

3

not think they looked that bad. Several hours later, she went to the store and purchased bandages, hydrogen peroxide, and Neosporin (an antibiotic cream).

Mother also spoke with police officers that night and gave a somewhat different version of the events. She told the officers that only N.L. left the bathroom, and a few minutes later, began calling for J.L. When J.L. and N.L. returned, N.L. was wearing different clothing that had wet spots on them. Although the children told her conflicting stories, mother understood that N.L. had turned on the stove, walked past it with a paper towel, and the paper towel caught fire and landed on N.L.'s arms. Mother saw the burns on N.L.'s arms and stomach. The burn on her stomach was red and some of the skin had been rubbed off. The skin had started to puss. Mother did not think the burns were that bad and did not want to have to gather all the children to go to the hospital. Instead, she rinsed it with water and put some Neosporin on it. She then waited about three hours, until all the children were asleep, and took N.L. to the store to get some bandages and cleaning solution to wash the burns.

Mother told officers that the next day N.L. forgot to put ointment on the burn; a blister popped and the nurse called her to come pick up N.L. from school. Mother said she was "taking care of some business" and told the nurse she would be there in 35 to 40 minutes but, instead, she went home to take a nap. N.L.'s father, C.L., eventually went to pick N.L. up from school.

The school nurse said that N.L. had complained of pain on her stomach. Mother was called at 9:10 a.m., and mother said she would be there in 15 minutes. When mother did not show up, she was called again and mother said she would be there in a half-hour. Mother, again, did not show up and a third call was placed. Mother said she would be there immediately, but never showed up. C.L. came to the school at 1:30 p.m. and seemed upset and shocked, and did not appear to have known what happened to N.L.

Police officers were also able to obtain a statement from N.L. the night of May 13, 2014. N.L. stated she had a paper towel that caught fire as she walked by the stove. She

4

dropped the towel and it landed on her arms, burning her arms and stomach. She was crying and screaming for her mother, who was in the bathroom with the door open, but her mother never came. She was crying for hours. Later that night, after her siblings went to sleep, her mother took her to the store to get something to clean the burns.

The police officer, observing N.L.'s burn wounds, described the minor to have " . . . multiple severe burn marks on her forearms and stomach. The marks on her forearms and wrists were black and charred over. There was an open skin wound approximately 2 inches in length on her right forearm, and another approximately 3 inches in length on her lower stomach. The burn marks on her stomach were charred, and were concentrated on the right side of her stomach just under her belly button."

Section 300 petitions were filed on behalf of minors M.D., Jr., D.D., T.D., J.L., N.L., and S.L. The petitions alleged, pursuant to section 300, subdivision (b), that mother had failed to provide adequate care and shelter for the minors in that the home did not meet basic health and safety standards. It further alleged mother had failed to provide adequate care, supervision and protection for the minors, as demonstrated by N.L. getting severely burned and mother's failure to obtain appropriate medical care for the burns.

When interviewed for the jurisdiction and disposition report, father C.L. stated that the house was not "that messy." He stated N.L. should not have gotten burned like that and was upset that mother was there and all she did was go to the store for cream. He thought mother made a "bad choice" not taking the minor to the doctor and could not believe mother did not think the burns were serious.

When mother was interviewed for the jurisdiction and disposition report, she explained the condition of her home was a result of the fact she was in the process of spring cleaning and remodeling. She also explained that she had had a lot of people over the previous weekend. She maintained the minors were being completely taken care of and "blessed."

5

A Child Protective Services (CPS) background check revealed 10 previous CPS reports on the family, dating back to 2001. The first report alleged mother was positive for marijuana at the birth of her child, whom she continued to breast feed after admitted marijuana use. In February 2007, a report alleged the minors were often seen without jackets or shoes, were not appropriately dressed for the weather, were not being fed properly, and had rotten teeth.

In May 2012, a report revealed severe medical neglect of T.D., who was suffering in pain due to "much needed dental care." T.D. had been in pain for three months and was unable to chew on one side. Mother had been asked "repeatedly" to take him to the dentist. Free emergency dental care was arranged, and school staff had gone to mother's home twice to inform her of the urgency. Mother continually failed to obtain dental care. Mother complained that she did not have money to take the bus so the school gave her bus fare. T.D. went to school in dirty clothes and smelled like urine.

In January 2014 (four months before N.L. sustained her burns), mother again failed to obtain medical or dental care for T.D. T.D. had a broken tooth. The school made multiple attempts to contact mother, including telephone messages and sending written messages home, all to no avail. T.D.'s jaw swelled and became painful after the condition worsened.

After a contested hearing, at which both mother and father C.L. testified, the juvenile court sustained the allegations in the petitions as to minors D.D., J.L., N.L., and S.L. The minors were adjudged dependents and ordered removed from parental custody. Jurisdiction was not taken as to minors M.D., Jr., and T.D. due to concurrent wardship proceedings and pending section 241.1 joint assessments.

DISCUSSION

I

*Removal*

Mother contends there was insufficient evidence to support the juvenile court's findings that the minors were at substantial risk of physical harm so as to justify their removal from her custody.

To support an order removing a child from parental custody, the juvenile court must find clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The juvenile court must also "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (d).)

" 'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.]' [Citation.] ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]' [Citation.] We review a dispositional order removing a child from parental custody for substantial evidence." (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

*Conditions of the Home*

The juvenile court's conclusion that mother's failure to recognize the risks associated with unsafe and unsanitary conditions in the home presented a risk of substantial danger to the minors is supported by the record.

7

The evidence supports the finding that the home was filthy and unsanitary--and had been for quite some time. There was standing slimy water in the kitchen sink, moldy stagnant water in the bathtub, days-old food laying out, ground-in filth on the floors, and garbage and diapers strewn everywhere. One of the minors reported that the house was "sometimes" clean but had been unclean for two weeks. The health hazards posed by the conditions of the home--particularly in light of the fact that there are five children under the age of 13 living in the home, including one who is only eight months old and likely crawling around in the filth and having access to the moldy standing water, and another minor has open burn wounds--is apparent.

Despite mother's claims to the contrary, there was no evidence she had adequately corrected the conditions of the home by the time of the disposition hearing. Mother argues in her opening brief that she had indicated at the disposition hearing that she had subsequently cleaned up her house. However, her record citation refers only to counsel's statements in closing argument. It is axiomatic that arguments of counsel are not evidence. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 895, fn. 9.)

At best, mother claimed that, prior to the minors' detention, she picked up some trash (she claimed someone else must have dumped on the floor) and the raw meat left on the counter. And she claimed that she had problems with the plumbing, causing the sink and bathtub to back up, and that "PG&E is out now at least working on replacing pipes." There was some evidence from father C.L., who had described the condition of the home as "so so," that he had begun "the process" of cleaning up the house shortly after the minors were detained. C.L., however, was no longer in a relationship with mother and did not live in the home.

Moreover, mother did not even acknowledge that the conditions of the home were unacceptable in the first place. She made the incredible claim that it had been clean two days earlier, despite the officer's observations that the residence "was completely strewn

8

with garbage," had food remnants that had "obviously been left out for several days all over the house," and had a bathtub with stagnant water that was growing mold. Mother also attempted to justify the filthy and unsanitary condition of her home by telling the social worker that she had been in the process of spring cleaning and remodeling. Mother later claimed, during trial, that a lot of the unsanitary conditions were "staged" by either police officers or the social worker, who made the mess themselves.

Despite the filth, mother failed to acknowledge or recognize the disgusting condition of the home. Based on the evidence, the juvenile court could reasonably conclude that the filthy condition of the home was not an unusual or fleeting state and that it posed a risk of substantial danger to the minors.

*Failure to Provide Medical Care*

In any event, this is not a case of simply a dirty home. Mother failed to properly supervise, protect and care for her children, and failed to provide reasonable medical care for N.L. after she sustained severe burns. These sustained allegations provide an additional need for removal of the minors.

CPS had received several previous referrals for failure to provide adequate medical and dental care for these minors. In May 2012, there was a report of severe medical neglect of T.D., who was suffering severe pain for months due to much needed dental care. Despite school officials' repeated attempts to get mother to take him to the dentist at no cost to mother, mother refused to get him the professional care he needed. Again, in January 2014, mother refused to respond to the school officials' attempts to get her to address T.D.'s swollen and painful jaw, due to a broken tooth.

Only four months later, N.L. was burned while in mother's care. The burns were described by a police officer as "multiple severe burn marks on her forearms and stomach." Some of the marks were "black and charred over." Yet, despite these severe second and third degree burns, mother did not obtain any professional medical care for

9

N.L. When asked why she did not take N.L. to the hospital, she explained that is was too much trouble to pack up all the other children to go. Declaring that the burn wounds "didn't look that bad," mother has consistently maintained that her home medical care of those burns were reasonable--home care that consisted of waiting three hours and then putting nonprescription ointment on it. Yet, mother admitted that the burns on N.L.'s stomach were red, some of the skin had been rubbed off, and it had already started to puss.

Mother again shirked her responsibility to provide proper medical care for N.L. by failing to attend to the minor's wounds the following day. She then attempted to shift that responsibility to the six-year-old minor, telling the social worker that the reason the child came to school with swelling and a burn blister that subsequently popped was because *the six-year-old N.L.* had forgotten to re-dress the wound. Ignoring her responsibilities as a parent yet again, when the school nurse called to have the minor picked up from school because the minor was in pain, mother said she would pick her up but went home to take a nap instead. Finally, mother has never acknowledged the risk to N.L. in being exposed to the unsanitary conditions of the home while suffering open burn wounds.

In light of the severity of N.L.'s injury, mother's failure to recognize the emergency nature of that injury, mother's history of medical neglect, and mother's failure to recognize her neglect, the evidence amply supports the juvenile court's conclusion that the minors remained at risk as long as they were in her care. The dispositional order removing the minors from mother's custody is supported by the evidence.

II

*Alternatives to Removal*

Mother contends that removal was not necessary because regular monitoring could assure that the conditions of the home remained suitable and safe. She argues that *In re*

10

*Jeannette S.* (1979) 94 Cal.App.3d 52 (*Jeannette S.*) supports her position. We conclude the evidence supports the finding that there were no reasonable alternatives to removal.

Section 361, subdivision (c) provides in relevant part: "A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following: [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

*Jeannette S.*, *supra*, 94 Cal.App.3d 52, involved a five-year-old minor removed from the filthy home of a possibly schizoid mother, who was of above average intelligence, and who had herself called CPS for assistance. The mother's repeated requests for assistance from the welfare department triggered dependency proceedings. Other than being very dirty, the child was well nourished, in good health, and doing well in school, and had a close and loving relationship with her mother. (*Id.* at pp. 56-58.) The court found substantial evidence to support the jurisdictional finding because the home was filthy, the child had no adequate place to sleep because of the clutter, and witnesses verified the filthy condition of the home was not an isolated incident. (*Id.* at pp. 58-59.) However, the court found insufficient evidence to support the dispositional order because of the failure to consider less drastic alternatives than removing the minor from the custody of her mother and father. (*Id.* at pp. 59-61.)

Unlike *Jeannette S.*, where there was a five-year-old minor who was in good health and in no immediate danger from the conditions of the home, here there were five to six children living in the home, including an infant only nine months old. Additionally, mother never acknowledged the unsafe and unsanitary conditions of her home, instead providing weak excuses for subjecting the minors to such filthy living

11

conditions, and there was no evidence she had adequately corrected the conditions of the home by the time of the disposition hearing.  Mother's indifference to the conditions of her home, and her failure to recognize the risks it presents, suggests it is unlikely she would maintain adequate conditions, even with assistance.

Additionally, mother's unresponsiveness to her children's pain and failure to recognize when medical care is necessary, demonstrated by her failure to obtain medical care for N.L.'s burns, as well as her failure to obtain medical and/or dental care for T.D. on more than one occasion, show that the minors are at substantial risk if they remain in her care.  Mother proffers the solution of having a social worker or public health nurse regularly come by the residence to monitor the minors' physical condition.  (See *In re Hailey T.* (2012) 212 Cal.App.4th 139, 147-148.)  Such visits would not, however, adequately protect the minors from the dangers they face due to mother's failure to provide them adequate medical care, especially since, as the juvenile court found, mother fails to recognize and respond to genuine emergencies.

No amount of monitoring can assure that mother will take reasonable medical measures should one of the children be injured or become ill in her care.  Until mother can establish she can benefit from the provision of services, there is ample evidence the minors' physical health, safety, protection and well-being would be in serious jeopardy if they were returned to her custody and there are no reasonable alternatives to removal.

Finally, mother argues, in a single paragraph, that the juvenile court did not make a sufficient finding that there were no reasonable alternatives to removal.  She makes this argument despite acknowledging that the juvenile court expressly stated that there were "no reasonable means by which the children's well-being can be protected without removing the children from the parents."  The record also contains the same written finding.

As a preliminary matter, this argument is not subsumed in her heading, which reads:  "The Record Does Not Support a Finding That There Was No Reasonable

12

Alternative to Removal." To the extent mother is complaining that the juvenile court's statement in connection with its ruling does not sufficiently indicate it considered all the potential alternatives to removal, her failure to set forth her argument under a separate heading or subheading forfeits the claim. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4.)

Furthermore, mother made no objection to the juvenile court's reasoning or finding by claiming that it was insufficiently specific or failed to adequately indicate the consideration of alternatives to removal. As a result, her claim is forfeited on appeal. (*People v. Walker* (1991) 54 Cal.3d 1013, 1023; *People v. Saunders* (1993) 5 Cal.4th 580, 589-590 [failure to make timely assertion of a right before a tribunal having jurisdiction to determine it results in forfeiture of that right].)

In any event, the record refutes her claim. The juvenile court expressly found there were "no reasonable means by which the children's well-being can be protected without removing the children from the parents." This finding complies with the requirements of the statute. (§ 361, subd. (c)(1).) The juvenile court was not required to expressly state that it considered less drastic alternatives to removal, as that can be reasonably inferred by the finding made.

DISPOSITION

The judgment is affirmed.


      HULL       , Acting P. J.


We concur:


     MAURO     , J.


     RENNER     , J.